IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KEVIN LYON,

        Plaintiff,

vs.                                    Case No. 12-2176-JTM

LISA MORELAND-LYON,

        Defendant.

MEMORANDUM AND ORDER

This matter comes to the court on petitioner Kevin Lyon's Verified Petition for Return of Child to England and Issuance of Show Cause Order (Dkt. No. 1). Mr. Lyon seeks the return of his three-year-old son, F.M.S.L., to England under the Hague Convention on the Civil Aspects of International Child Abduction, done Oct. 25, 1980, T.I.A.S. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (1986) made applicable to the United States by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq*. Mr. Lyon contends the respondent, Lisa Moreland-Lyon, the child's mother, unlawfully removed F.M.S.L. from England to Kansas in August 2011. Ms. Moreland-Lyon contends she did not wrongfully remove the child under the Act, that Kansas is the child's habitual residence, and that the Kansas state court has jurisdiction to determine the child's custody. She also argues that the well-settled exception applies, or that Mr. Lyon consented and acquiesced in F.M.S.L.'s removal. She requests this court dismiss the petition for lack of subject matter jurisdiction.

The court held a hearing on May 18, 2012, in which it announced a preliminary ruling from

the bench. This Memorandum and Order serves to memorialize the court's earlier findings of fact and conclusions of law. For the following reasons, the court grants Mr. Lyon's motion and orders that F.M.S.L. be returned to England.

**I. Factual Background**

Mr. Lyon and Ms. Moreland-Lyon met each other while she was on vacation in England in 1995, and he was her tour guide. He is a citizen of the United Kingdom, and she is a citizen of the United States. They began dating by phone in 1996 and by the end of 1997 or early 1998, Ms. Moreland-Lyon moved into Mr. Lyon's home in Prestwich, Manchester, England. After dating for four years, the couple married on October 28, 1999. For the next ten or eleven years, the couple lived in Prestwich. But it was normal for Ms. Moreland-Lyon to visit her mother in Kansas annually, coinciding with the Bonner Springs Renaissance Festival, which lasted for about seven weeks from early September through October. Ms. Moreland-Lyon worked at the Renaissance Festival as a face painter. She also sporadically worked at various schools as a substitute teacher. Mr. Lyon would travel to the United States during this time for shorter visits as his work schedule allowed. While in England, Ms. Moreland-Lyon upgraded her academic qualifications in a school in the United Kingdom and obtained residency.

In 2008, they decided to have a child, and Ms. Moreland-Lyon became pregnant with their son. In March 2009, she gave birth to F.M.S.L. in Manchester. She stayed in the United States for some of the pregnancy but traveled back to England in January 2009, in part to take advantage of England's universal healthcare system and so that F.M.S.L. would be eligible to receive "child benefit," which is provided to all children born in England. Half of this child benefit was deposited

regularly into Ms. Moreland-Lyon's English bank account for F.M.S.L.'s benefit. Mr. Lyon has also deposited money in this bank account for F.M.S.L. for the last three years.

Since birth, F.M.S.L. has lived in both the United States and England at various times. In the fall of 2009, Ms. Moreland-Lyon traveled with F.M.S.L. to the United States to attend the Renaissance Festival as she had done in the past. During their time in Kansas, they stayed with Ms. Moreland-Lyon's mother and stepfather in Overland Park, Kansas. Mr. Lyon visited for about a week in October. Ms. Moreland-Lyon and F.M.S.L. returned to England in early December. The couple spent Christmas in Manchester. From December 2009 to August 2010, Mr. Lyon, Ms. Moreland-Lyon, and F.M.S.L. lived in England in the couple's home and did typical family things. In early May 2010, the couple was outbid on a home they were looking at in Prestwich, which upset Ms. Moreland-Lyon. She was eager to move out of their home in Prestwich to this larger home nearby.

Ms. Moreland-Lyon and F.M.S.L. traveled back to Kansas for the Renaissance Festival in August 2010. The plan was for Ms. Moreland-Lyon to remain in Kansas for the duration of the festival and to return to England by October 28. She did not return by that date and decided to remain in Kansas longer. Shortly thereafter, Mr. Lyon traveled to Kansas to try and persuade her to come back to England. Ms. Moreland-Lyon refused to return in November or December and gave vague answers about her intentions to return to England. Near Christmas, Mr. Lyon traveled back to Kansas so he could be with his son. He also briefly considered applying for a Green Card so that he could pass through American airports more quickly. He did not intend to move to the United States. Mr. Lyon testified that he did not know at the time that there were irreconcilable differences in the marriage.

From January 2011 through spring, Mr. Lyon pleaded with Ms. Moreland-Lyon to return to England, to no avail. With F.M.S.L. still in the United States in early March, Mr. Lyon traveled to Kansas again to be with him on his birthday. He stayed with Ms. Moreland-Lyon and F.M.S.L. in an apartment in Overland Park that Ms. Moreland-Lyon was renting. Finally, Mr. Lyon spoke to Ms. Moreland-Lyon's mother, who eventually persuaded her to return to England with F.M.S.L. on May 11, 2011.

Mr. Lyon testified that the couple experienced happy times in their marriage during May and June. By late June, Mr. Lyon informed Ms. Moreland-Lyon that he did not want her to take F.M.S.L. out of England for the 2011 Renaissance Festival. She refused to leave without him. To try to improve the situation, the couple attended three counseling sessions with a professional counselor. The counselor suggested that they consider a family mediation service. After the counseling sessions, but before the mediation, there was an incident concerning F.M.S.L.'s United States passport.

One morning in mid July, Ms. Moreland-Lyon began asking Mr. Lyon about his travel times for the day because he was scheduled to be in Liverpool. He began to feel as though Ms. Moreland-Lyon was about to take F.M.S.L. back to the United States, so he took F.M.S.L.'s United States passport. He found the passport in Ms. Moreland-Lyon's packed suitcase. A few days later, Ms. Moreland-Lyon called the police to have F.M.S.L.'s passport returned, but Mr. Lyon refused. Soon thereafter, the couple attended a mediation and reached an agreement on Ms. Moreland-Lyon's visit to the United States for the 2011 Renaissance Festival. Generally, the agreement provided that Ms. Moreland-Lyon would leave for the United States on August 4, 2011, and return to England on December 11, and that Ms. Moreland-Lyon and F.M.S.L. would return to the United States on

February 1, 2012, and stay through August 14. Ms. Moreland-Lyon testified that she signed the agreement under duress because it was the only way she would get F.M.S.L.'s United States passport returned to her. On August 4, Ms. Moreland-Lyon and the child flew to Kansas. Mr. Lyon drove them to the airport and paid for the tickets. Mr. Lyon traveled to Kansas in October. During the visit he met with Barbara Lyons, Director of the Johnson County Montessori Preschool and Day Care. The child is currently enrolled and attending the preschool.

On December 9, Ms. Moreland-Lyon informed Mr. Lyon that she was not going to return to England on December 11 unless she had assurances from him that he would abide by the terms of the mediated agreement. Mr. Lyon provided several written assurances that he would abide by the agreement, yet Ms. Moreland-Lyon has refused to return to England with F.M.S.L.

At present, the child is located in the District of Kansas, living with Ms. Moreland-Lyon in Overland Park. As in England, F.M.S.L. has a pediatrician and dentist in Kansas, and is flourishing in his environment.

In December 2011, Ms. Moreland-Lyon initiated divorce proceedings against Mr. Lyon in Kansas state court. The court entered Ex Parte Temporary Orders providing for rights of custody and access to Mr. Lyon and ordered the parties to participate in mediation to come up with a permanent parenting plan. A Decree of Divorce was entered in the case on April 16, 2012. The court found that Ms. Moreland-Lyon and the child "have been actual residents of the State of Kansas since August 3, 2010." The court stayed ruling on the custody of the child pending the outcome of the present Petition for Return of Child.

**II. Conclusions of Law**

Mr. Lyon filed this Petition on March 23, 2012, seeking an order from this court directing the prompt return of the child to England. He also seeks an order directing Ms. Moreland-Lyon to pay for his legal costs, fees, and expenses. Ms. Moreland-Lyon requests that the court dismiss the Petition and argues that Kansas is the child's habitual residence. The dispute is whether F.M.S.L. was wrongfully removed from England and whether England is the child's habitual residence.

### A. Wrongful Removal and Habitual Residence

The Hague Convention, as implemented by both the United States Congress through ICARA and by the United Kingdom, was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble. The Hague Convention is meant to provide a mechanism for the child's prompt return once it has been shown that the child was wrongfully removed to or retained in an affiliated state. *Id.*, art. 1. If a court finds a child has been wrongfully removed, the court must order that the child be returned. *Id.*, art. 12.

> Under the Hague Convention, a removal or retention is "wrongful" if:
>
> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

*Id.*, art. 3; *see also In re Hague Child Abduction Application*, No. 08-2030, 2008 WL 913325, at *7 (D. Kan. Mar. 17, 2008). The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 11603(e)(1)(A); *see also Shealy*

*v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002). Specifically, the petitioner must show (1) that the child was a habitual resident in a given state at the time of the removal or retention, (2) that the removal or retention was in breach of the petitioner's custody rights under the laws of that state, and (3) that the petitioner was exercising those rights at the time of the removal or retention. Hague Convention, art. 3; *see also Shealy*, 295 F.3d at 1122.

1. Habitual Residence

As noted above, Mr. Lyon must first show that the child was a habitual resident of the United Kingdom at the time of the removal. Neither the Hague Convention nor ICARA define the term "habitual residence." Rather, "courts have been instructed to interpret the expression 'habitual residence' according to 'the ordinary and natural meaning of the two words it contains [, as] a question of fact to be decided by reference to all the circumstances of any particular case.'" *Mozes v. Mozes*, 239 F.3d 1067, 1071 (9th Cir. 2001) (quoting C v. S, (*minor: abduction: illegitimate child*), [1990] 2 All E.R. 961, 965 (Eng. H. L.)). The court's determination of the child's habitual residence is a mixed question of law and fact. *Stern v. Stern*, 639 F.3d 449, 451 (8th Cir. 2011). Article 3 of the Hague Convention mentions the period immediately before an alleged wrongful removal or retention as the relevant time to be considered. The determination requires consideration of where the child lived before the removal, the parents' conduct, their intentions, and any agreements made by the parents during that time. *In re Hague Child Abduction Application*, 2008 WL 913325, at *7 (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1251-52 (11th Cir. 2004)). Further, a determination of which state is a child's habitual residence must focus on the child and must consider the child's circumstances in that state and the parents' present, shared intentions regarding

the child's presence in that state. *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).

The Ninth Circuit, in *Mozes*, has concluded that for a state to gain habitual-residence status there must be a "settled purpose." 239 F.3d at 1074. "The purpose may be one or there may be several. It may be specific or general. All the law requires is that there is a settled purpose." *Id.* Essentially, settled purpose means a "settled intent" to abandon a previous habitual residence. *Id.* at 1075. The settled intent is determined by looking at the intent of the parties, and "courts must determine from all available evidence whether the parent petitioning for return of the child has already agreed to the child's taking up habitual residence where it is." *Id.* at 1076. When a child's removal was initially intended to be for a specific limited period, "courts have refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.* at 1077.

Here, F.M.S.L. has traveled back and forth from England to Kansas several times. Since birth he has lived in England for approximately 16 months and Kansas for 14 months, not including the last 10 months since he was removed from England. The total number of months F.M.S.L. has spent in each country is not determinative of the habitual residence issue. As such, the court must look to the parents' conduct, intentions, and any agreements they may have made regarding the child's living arrangements before and after removal. The court finds the following facts persuasive. It is clear from the testimony that England was the couple's home throughout their marriage. Ms. Moreland-Lyon lived in England throughout the marriage except during her trips to the United States to work at the Renaissance Festival and to substitute teach. But those trips were relatively short in duration. Mr. Lyon continued to live and work in England full-time and only traveled to the United States for brief vacations. Additionally, F.M.S.L. was born in England. He lived in England

for the first five months of his life, and returned to the United States only for the Renaissance Festival in 2009, 2010, and 2011. During those three years the plan was that Ms. Moreland-Lyon would reside in the United States with F.M.S.L. during the Renaissance Festival as she had done in the past before he was born. Each year, Ms. Moreland-Lyon unilaterally extended those stays in the United States without Mr. Lyon's consent. Ms. Moreland-Lyon's changed intentions were the sole reason F.M.S.L. was away from England for long periods of time, and this court finds that her unilateral actions did not change F.M.S.L.'s habitual residence. *See Mozes*, 239 F.3d at 1077. Therefore, England is F.M.S.L.'s habitual residence.

In order to establish that Ms. Moreland-Lyon wrongfully removed F.M.S.L., Mr. Lyon must also show that the removal was in breach of his custody rights under the laws of England and that he was exercising those rights or that he would have exercised those rights absent the removal.

### 2. Breach of Custody Rights

It is undisputed (1) that the parties were married when Ms. Moreland-Lyon removed F.M.S.L. from England, (2) that Mr. Lyon is F.M.S.L.'s father, (3) that the parties divorced on April 16, 2012, (4) that no court has ordered custody in this matter, and (5) that the parties had an informal agreement regarding visitation. Mr. Lyon has rights of custody under English law under the Children Act 1989 and the Child Abduction Act 1984. Both acts provide that couples married at the time of a child's birth have joint parental responsibility for the child. Ms. Moreland-Lyon does not contest that her removal breached these custody rights. Therefore, Mr. Lyon has custody rights to F.M.S.L., and Ms. Moreland-Lyon's removal of the child to the United States violated those rights.

### 3. Exercising Custody Rights

It is also uncontested that Mr. Lyon was exercising his custody rights. In addition to his personal interaction with his son, he remitted monthly sums to Ms. Moreland-Lyon's bank account for the benefit of F.M.S.L., he communicated with F.M.S.L. by video over the internet, and he gave F.M.S.L. a book of pictures, which they called a "daddy book." Thus, it is clear that Mr. Lyon has exercised his custody rights.

### B. *Affirmative Defenses*

Even though Mr. Lyon has proved that Ms. Moreland-Lyon wrongfully removed F.M.S.L. from his habitual residence, she may avoid removal to England if she can show that an exception provided in Article 13 of the Hague Convention applies. The affirmative defenses in the Hague Convention are construed narrowly, and Ms. Moreland-Lyon has the burden of proving that an exception applies. 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."). Even if one of the affirmative defenses applies, whether to return the child remains in the discretion of the trial court. Hague Convention, art. 18.

There are several affirmative defenses under the Hague Convention. Ms. Moreland-Lyon has alleged two of them: (1) that Mr. Lyon has known for over a year that Ms. Moreland-Lyon intended to reside with the child in Kansas and that the child is well settled in Kansas; and (2) that Mr. Lyon acquiesced and consented to the child's residence in Kansas. Both of these defenses must be established by a preponderance of the evidence.

### 1. Well-Settled Exception

The well-settled exception provides that if proceedings are commenced more than one year after a wrongful removal, the child should not be returned if he has become well settled in and accustomed to the new surroundings. Hague Convention, art. 12. Here, F.M.S.L. was removed from England to Kansas on August 4, 2011. Proceedings were commenced less than a year after that date. Thus, this exception does not apply. Ms. Moreland-Lyon attempts to avoid the one-year barrier by arguing that the actual removal date was August 2010, or that Mr. Lyon was on notice that she did not intend to return to England with F.M.S.L. by December 2010. However, the facts at the hearing do not show that F.M.S.L. was removed from England permanently until August 2011. It may have been Ms. Moreland-Lyon's unilateral intent in August 2010 that the child would not return to England, but the facts show that he did return to England in 2011. And Mr. Lyon did not have reason to believe Ms. Moreland-Lyon intended to remove their son from England in August or December 2010.

Regardless, the court is not persuaded that F.M.S.L. is well settled in Kansas simply because he has a doctor, dentist, a preschool, and people looking after him in Kansas. The facts indicate F.M.S.L. had those things in England too. There is no dispute that F.M.S.L. was doing well in Kansas or that he was acclimated to living there. But he also had acclimated to life in England, and he is young enough that he could grow accustomed to nearly any location within a short period of time. "[I]n the absence of settled parental intent, courts should be slow to infer from [the contacts noted above] that an earlier habitual residence has been abandoned." *Mozes*, 239 F.3d at 1079. For these reasons, the court finds that the well-settled exception does not apply.

11

2. Acquiescence and Consent Exception

Under this exception, the court is not required to return the child if it finds that the respondent has established that the petitioner consented to or acquiesced in the removal. The consent defense requires that the respondent show that the petitioner consented to the removal before the removal. Acquiescence focuses on the petitioner's conduct after removal.

Here, Ms. Moreland-Lyon argues that Mr. Lyon consented to the removal in August 2011 because he drove her and F.M.S.L. to the airport when they left England. These actions do not indicate that Mr. Lyon consented to F.M.S.L.'s permanent removal from England. Rather, Mr. Lyon did not really have a choice in the situation. Under the mediation agreement, Ms. Moreland-Lyon and F.M.S.L. were scheduled to leave for the United States. Mr. Lyon merely did what was in his nature—he drove his son and wife to the airport because he believed it was the right thing to do.

Ms. Moreland-Lyon argues that Mr. Lyon acquiesced in the removal by meeting with the Montessori school in Johnson County. Yet this does not indicate Mr. Lyon's acquiescence to F.M.S.L. living permanently in Kansas. Mr. Lyon testified that he looked at the school and ultimately enrolled his son there so that he could benefit from the opportunities the school provided. Enrollment in the school only shows that Mr. Lyon was trying to do the best for his son despite the couple's marital problems. Thus, the acquiescence argument fails.

*C. Attorney's Fees*

Last, Mr. Lyon has requested attorney's fees and costs from Ms. Moreland-Lyon. ICARA provides that "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of

the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent established that such an order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). At present, the parties have not presented any evidence regarding expenses or attorney's fees. Therefore, the court will await further briefing on this issue to determine whether an award of attorney's fees in this matter is appropriate.

### III. Conclusion

Mr. Lyon has presented facts showing that England was F.M.S.L.'s habitual residence, that the removal violated his custody rights, and that he was exercising those custody rights. The well-settled exception does not apply because a year has not passed since the wrongful removal. Additionally, the consent and acquiescence exception does not apply. Therefore, the court grants Mr. Lyon's petition. The court refrains from issuing an order regarding attorney's fees at this time.

IT IS ACCORDINGLY ORDERED this 1st day of June 2012, that Kevin Lyon's Verified Petition for Return of Child to England and Issuance of Show Cause Order (Dkt. No. 1) is granted.

IT IS FURTHER ORDERED that neither party shall remove F.M.S.L. from Kansas until he is returned to England. If either party removes the child in violation of this Order, the court shall issue a warrant for the arrest of the removing party and appearance for a contempt hearing.

IT IS FURTHER ORDERED that F.M.S.L. shall be promptly returned to England. By agreement of the parties, Mr. Lyon shall pay for the airline tickets for F.M.S.L. and for Ms. Moreland-Lyon.

IT IS FURTHER ORDERED that Mr. Lyon's counsel shall coordinate all other aspects of

F.M.S.L.'s return to England with Ms. Moreland-Lyon's counsel. The Clerk of the Court is directed to release F.M.S.L.'s United Kingdom passport in order to facilitate his return to England.

IT IS FURTHER ORDERED that Mr. Lyon shall report F.M.S.L.'s arrival to the appropriate United Kingdom and United States Central Authorities.

IT IS FURTHER ORDERED that the parties' parental access to F.M.S.L. in England shall be as agreed between the parties and their counsel pending any orders made by a court with jurisdiction in England. Neither party shall unreasonably withhold his or her agreement to access.

IT IS FURTHER ORDERED that all issue regarding Ms. Moreland-Lyon's living arrangements in England shall be determined by agreement of the parties or by order of an appropriate English court.

IT IS FURTHER ORDERED that this Order is not a determination of the merits of any custody issue within the meaning of Article 19 of the Hague Convention.

                                                         s/ J. Thomas Marten
                                                         J. THOMAS MARTEN, JUDGE